IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS


RICKY W. MARKHAM,

                    Plaintiff,

        Vs.                                              No.  08-4032-SAC

BTM CORPORATION,

                    Defendant.


MEMORANDUM AND ORDER

        The case comes before the court on following motions:  the

defendant BTM Corporation's ("BTM's") motion for partial summary

judgment (Dk. 78), motion for summary judgment (Dk. 82), motion to

exclude testimony of Mark Passamaneck (Dk. 91), motion to exclude

testimony of Dr. Sabapathy (Dk. 92), and motion to strike (Dk. 98); and the

plaintiff Ricky W. Markham's ("Markham's") motion in limine (Dk. 90).  The

number of motions, the length of the briefs, and the dense presentations of

facts and arguments are not consistent with the relatively simple and

uncontested set of facts making up this product liability case.  The court's

delay in disposing of these motions is largely due to the prolixity, the

redundancies, and the sweeping breadth in the parties' presentations.

        Ricky Markham worked as a maintenance mechanic at Amarr

Garage Door Company in Lawrence, Kansas, and was injured while assisting another maintenance mechanic in making adjustments to the punch depth of a Tog-L-Loc industrial press manufactured by BTM. The other maintenance employee, who Markham was assisting, accidently hit the "emergency stop" button on the machine while Markham's right arm was inside the machine. The industrial press was manufactured to return to the upward "home" position when the "emergency stop" button was depressed. Markham's arm was trapped and injured when the press returned to the home position. At the time of the accident, the plaintiff and the other maintenance mechanic were making these adjustments without powering down the Tog-L-Loc but with the machine in its manual operation mode.

**BTM'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Dk. 78)**

By this motion, the defendant seeks summary judgment on the plaintiff's claim for damages resulting from a cardiac condition and hypertension. BTM contends the plaintiff has no expert witness testimony to support that these particular damages were caused or contributed to by his injury from this allegedly defective machine. The pretrial order includes the following as one of the plaintiff's questions of fact: "(3) Whether

plaintiff's cardiac condition was caused or contributed to by a defect in the BTM Press."   (Dk. 73, p. 15).

The record does not include any response from the plaintiff to this pending motion.  The deadline for filing a response expired some time ago.  D. Kan. Rule 6.1(d)(2).  "If a responsive brief or memorandum is not filed within the Rule 6.1(d) time requirements, the court will consider and decide the motion as an uncontested motion.  Ordinarily, the court will grant the motion without further notice."  D. Kan. Rule 7.4.  Rule 56(e)(2) also provides that if the non-movant does not respond, then "summary judgment should, if appropriate, be entered against that party."  Based on its review of the defendant's motion and the plaintiff's failure to respond, the court grants the defendant's motion for partial summary judgment as uncontested and appropriate.

## BTM'S MOTION FOR SUMMARY JUDGMENT (Dk. 82).

### *Summary Judgment Standards*

Rule 56 authorizes judgment without trial "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).

Substantive law governs the elements of a given claim or defense and reveals what issues are to be determined and what facts are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is one which would affect the outcome of the claim or defense under the governing law. *Id.* If the movant would not have the burden of proof at trial on the particular claim or defense, then the motion must point to the absence of a genuine issue of material fact. Instead of disproving a claim or defense, the movant needs only show "a lack of evidence" on an essential element. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). To counter a "properly made" motion, the non-movant must "set out specific facts showing a genuine issue for trial" by way of admissible evidence in compliance with Rule 56(e)(1). The non-movant must show more than some "metaphysical doubt" based on "evidence" and not "speculation, conjecture or surmise." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Bones v. Honeywell Intern.*, 366 F.3d 869, 875 (10th Cir. 2004). "[T]he dispute about a material fact is 'genuine,' . . ., if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the nonmoving

party's evidence "is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Anderson*, 477 U.S. at 255. Facts and reasonable inferences therefrom are to be viewed in the light most favorable to the nonmoving party. *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1273 (10th Cir.2005). At this stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587. *See Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1058 (10th Cir.2009).

*Stipulations of Fact from Pretrial Order*

1.  On February 20, 2006, the plaintiff, Ricky W. Markham, was employed at Amarr Garage Door Company ("Amarr") in Lawrence, Kansas, as a maintenance mechanic.

2.  On the date in question, plaintiff was working third shift. Plaintiff received a request for back up from Charles Thompson, his co-worker.

3.  Mr. Thompson was making an adjustment to the punch depth of

the BTM Tog-L-Loc industrial press at Station 2. The machine was powered by both air (pneumatic) and electricity.

4. The subject machine was manufactured by the defendant, BTM Corporation.

5. The machine was in manual mode at the time of the adjustment, which meant that the press could be moved by pressing buttons. At the time of the adjustments, the press was in its most downward position. The conveyor belt was turned "off."

6. Mr. Thompson and plaintiff stood on opposite sides of the machine while they made the adjustment.

7. Neither plaintiff nor Mr. Thompson performed any check of the machine to determine whether it was turned off, or to determine whether lockout/tagout had been performed to ensure that the machine was not powered by air or electricity at the time of the adjustments.

8. Plaintiff did not lockout the air by bleeding off the air and did not lock out the electrical power by turning it off.

9. During the adjustment process, plaintiff and Mr. Thompson made two adjustments to the machine and made a test run after each adjustment. After each test run, the press was still not punching the holes

deep enough.

10.  During the third adjustment, Mr. Thompson dropped a wrench. When he bent over to pick the wrench up, he accidently hit the "emergency stop" button with his right shoulder while Mr. Markham's right arm was inside the machine.

11.  At this point in time, the press returned to its up, "home" position and trapped Mr. Markham's right arm between the press and the frame.

*Other Uncontroverted Material Facts*

12.  The Occupational Safety and Health Act ("OSHA") has a regulation, 29 C.F.R. § 1910.147, that "covers the servicing and maintenance of machines and equipment in which the unexpected energization or start up of the machines or equipment, or release of stored energy could cause injury to employees."  This regulation is entitled, "The Control of Hazardous Energy (Lockout/Tagout)."

13.  Amarr had its own lockout/tagout policy that imposed procedures to protect employees "from potential hazards caused by unexpected equipment activation or the release of stored energy."  (Dk. 83-5, Ex. D). The policy defined "covered activity" as:

> Any activity performed in the work place during which the unexpected activation of equipment or the release of stored energy could cause

injury. This policy includes, but is not limited to, the following types of covered activities: installation, maintenance, inspection, repair, adjustment, etc.

*Id*. The policy generally required that "**[a]ll** potentially hazardous energy sources must be isolated and locked out." *Id*. The policy also laid out steps for employing the required lockout procedure. *Id*.

14. At the time Mr. Markham and Mr. Thompson were making the adjustments and the accident occurred, they had not locked out the electrical and pneumatic power to the BTM industrial press. Mr. Thompson knew how to lockout/tagout the electrical and pneumatic power to the machine. Mr. Thompson and Mr. Markham did not discuss performing this lockout/tagout procedure prior to making the adjustments that resulted in this accident. If the press had been locked out electrically for making the adjustments, the press would have been in the "up" or home position already, and it would not have pinched the plaintiff's arm as it did in this accident.

15. The plaintiff's expert witness, Joseph Skaggs, P.E., offers as one of his opinions:

4.2 Lockout/tagout procedures were not properly followed during the adjustment of the subject Tog-L-Loc press.
Bases for opinion:
4.2.1 In order to fully de-energize the machine, the electrical

> disconnect switch should have been switched to the "off"
> position and properly locked/tagged out. Per Mr. Markham, this
> procedure was not performed.
> 4.2.2 The pneumatic tank should also have been drained of air
> or isolated via a line valve during a lockout/tagout procedure, to
> ensure the machine was fully de-energized. The fact that the
> crosshead moved when the emergency disconnect switch was
> inadvertently activated indicates that there was air pressure in
> the pneumatic tank.

(Dk. 83-10, Ex. I). Mr. Skaggs also testified that if this press had been

locked out prior to the employees' adjustments to the punch depth, then

the accident would not have occurred as it did. The plaintiff's other expert,

Mark Passamaneck, P.E., testified similarly, as did the defendant's expert

witnesses, Lanny Berke, P.E., and Morris Farkas, professional safety

engineer.

16. The OSHA regulation, 29 C.F.R. § 1910.147(a)(2), on

lockout/tagout provides, in part, the following on its application:

> (2) Application.
> (i) This standard applies to the control of energy during servicing
> and/or maintenance of machines and equipment.
> (ii) Normal production operations are not covered by this standard
> (See subpart O of this part). Servicing and/or maintenance which
> takes place during normal production operations is covered by this
> standard only if:
>> (A) An employee is required to remove or bypass a guard or
>> other safety device; or
>> (B) An employee is required to place any part of his or her
>> body into an area on a machine or piece of equipment where
>> work is actually performed upon the material being processed

(point of operation) or where an associated danger zone exists during a machine operating cycle.

Note:  Exception to paragraph (a)(2)(ii):  Minor tool changes and adjustments, and other minor servicing activities, which take place during normal production operations, are not covered by this standard if they are routine, repetitive, and integral to the use of the equipment for production, provided that the work is performed using alternative measures which provide effective protection (See subpart O of this part).

17.  With regard to the "exception" noted above, the plaintiff's expert,

Joseph Skaggs testified in relevant part:

A.  I believe that that section could be interpreted in certain cases to apply to minor adjustments like a punch depth change on the machine that need to happen during production.  Specifically, I believe that that exception may provide a rationale for not locking out the machine while changing the punch depth.

Q.  What about the second half of that sentence where it says provided that?  What does it say after provided that?

A.  It says:  Provided that the work is performed using alternative measures which provide effective protection.

. . . .

Q.  Was it your understanding that they were performing this work under that second half of the statement, that there were alternative safety measures in place?

A.  I believe that that's what they thought.

Q.  That's what they thought or that's what the facts of the accident show?

A.  I believe that the situation that they were working in can be interpreted as meeting the conditions for that exception.

Q.  Knowing now that that machine is fully energized at the time that they were making this adjustment, do you still believe that the exception applies?

A.  Knowing that inadvertently hitting the E-stop button on the machine when it is energized will cause the crosshead to move, I think that contraindicates the alternative measures provision in

there.

(Dk. 104-4, p. 4, Dep. pp. 57-58).

18. The defendant's expert witness, Morris Farkas, in his report

opined:

> <u>Finally, even if it is assumed the exception applies, and it does not, it only applies "provided that the work is performed using alternative measures which provide effective protection</u> (see subpart O of this part)." Even if the exception applies Amarr Doors and the maintenance mechanics were required to use guards or blocks or braces under Subpart O to provide protection and no such alternative measures providing effective protection, such as a block or braces between the upper frame and the ram were used which would have prevented the ram from moving up. Therefore, the exception does not apply and lockout/tagout was required.

(Dk. 83-15, p. 15) (underlining in original).

19. Amarr's maintenance manager, Eric Bollinger, testified it wasn't

unusual at the time of the accident for residential products to be run on the

commercial product line on the third shift. Consequently, the punch depth

adjustment was necessary at the beginning and end of the third shift each

day. Mr. Bollinger testified that Mr. Markham and Mr. Thompson were only

making adjustments which could be in the manual mode without the

machine being locked out under Amarr's policy. Mr. Bollinger also testified

he was unsure of company policy but commented it was company practice

to allow adjustments without shutting down the machine assuming the

adjustment was not around pinch points or moving partes.

20.  Amarr employee, Charles Thompson, testified he did not lockout/tagout the machine because it was not required for adjustments. Another Amarr employee with three years experience, Terry Tidd, testified that consistent with his training and experience he had not seen the Tog-L-Loc locked out for depth adjustments.  Mr. Tidd described the manual mode of the Tog-L-Loc as nothing running unless the switch is physically turned to "on."

21.  A BTM job process sheet for this particular press shows a "Promised Ship Date 10-10-86."  BTM shipped this press with a guard covering the opening where the plaintiff had inserted his arm for making the adjustment when the accident occurred.

22.  In its current facility, Amarr did not have a manufacturer-issued owner's manual for this BTM industrial press.

23.  The National Fire Protection Association ("NFPA") Electrical Standard for Industrial Machinery 1985 at 7-5 Stop Circuits provides in part:  "(c)  Each machine shall incorporate at least one emergency stop device which, when actuated, shall stop all machine motions without creating other hazards."

24.  The plaintiff's expert witness, Joseph Skaggs, testified it was his opinion that this NFPA 79 7-5(c) standard required an emergency stop button to "halt all machine motion anytime the machine is energized regardless of its operating mode or what is being performed on the machine."  (Dk. 104-4, Ex. 3, p. 114).  Mr. Skaggs also testified that the "emergency stop button is designed to be the easiest button on the control panel to hit."  *Id.* at 122.  The buttons are often given a "mushroom head," and "[i]t is easy to brush up against them and set them off."  *Id.*  Mr. Skaggs testified that in his experience with industrial machines "there were a number of times [he had] inadvertently hit the emergency stop button while walking past it or while leaning up against it."  *Id.*

25.  The plaintiff's expert witness, Mark Passamaneck, testified that in his opinion the emergency stop button should be designed to operate as intended for all functions of the machine, not just the specific production line.

26.  The defendant's expert witnesses, Mr. Berke and Mr. Farkas, have offered opinions that the Tog-L-Loc does not violate the NFPA standard, because a person's hand would remain trapped creating another hazard if the ram did not release and return upward to the home position.

Mr. Farkas opined that the NFPA standard addresses the use of a machine in production, not maintenance. Mr. Berke also testified that NFPA 79 7-5(c) is inapplicable to this accident, because lockout/tagout was required.

27. Amarr's maintenance manager, Mr. Bollinger, testified he believed that emergency stop buttons functioned so as to cease all machine movement. Amarr's director of Safety, Craig Crane, testified the purpose of an emergency stop button was to stop the machine and to function in that way for anyone near the machine. Mr. Thompson and Ms. Longacre, Amarr employees, testified that they believed the emergency stop button on the Tog-L-Loc stopped the machine.

28. The plaintiff's expert witness, Mr. Passamanek, pointed to the emergency stop button operating in an unexpected way in raising the ram and opined that the manufacturer failed to provide warnings and information to the owner and users on the dangerous motion and pinch point created when the button was depressed.

*Plaintiff's Theories of Recovery*

As laid out in the pretrial order (Dk. 73), the plaintiff seeks to recover under the Kansas Product Liability Act ("KPLA"), K.S.A. 60-3301 *et seq.*, on the alternative product liability theories of strict liability and

14

negligence. For strict liability, the plaintiff asserts that the Tog-L-Loc press was defective in its design and lack of warnings as to be unreasonably dangerous to persons who might use the product. The alleged design defect is that the Tog-L-Loc's emergency stop button did not stop all machine movement but triggered the ram to return to its home or uppermost position. The failure to warn allegations point to the lack of a warning on the hazard created by the emergency stop button and to the lack of instructions for safely making punch depth adjustments. The plaintiff's negligence theories assert the defendant failed to use ordinary care in the design of the Tog-L-Loc and in providing adequate warnings on inherent dangers and instructions for safe use. The negligence theories are based on the same allegations on the hazard created by the emergency stop button, failure to warn about this hazard, and failure to instruct on making safe punch depth adjustments.

*Relevant Kansas Product Liability Law*

The KPLA was intended "to consolidate all product liability actions regardless of theory into one theory of legal liability." *Griffin v. Suzuki Motor Corp.*, 280 Kan. 447, 461, 124 P.3d 57 (2005) (quotation marks and citation omitted). "Kansas law recognizes three ways in which a

product may be defective:  (1) a manufacturing defect; (2) a warning defect; and (3) a design defect."  *Delaney v. Deere and Co.*, 268 Kan. 769, 774, 999 P.2d 930 (2000) (citation omitted).  On a strict liability claim, the plaintiff's burden of proof would include these elements:  (1) "[t]he product was in a defective condition and unreasonably dangerous to persons who might be expected to use the product," (2) "[t]he product was in a defective condition at the time it left the control of the defendant," and (3) [t]he defect in the product was the cause or contributed to cause plaintiff's injuries and damages."  PIK-Civil 4th 128.18 (2008), *see Jenkins v. Amchem Products, Inc.*, 256 Kan. 602, 630, 886 P.2d 869 (1994), *cert. denied*, 516 U.S. 820 (1995); *Siruta v. Hesston Corp.*, 232 Kan. 654, 668-69, 659 P.2d 799 (1983).

To recover on any products liability theory, the plaintiff must prove the defective product is the actual and proximate cause of the injury. *Miller v. Pfizer Inc. (Roerig Division)*, 196 F. Supp. 2d 1095, 1125 (D. Kan. 2002), *aff'd*, 356 F.3d 1326 (10th Cir.), *cert. denied*, 543 U.S. 917 (2004); *Wilcheck v. Doonan Truck & Equipment, Inc.*, 220 Kan. 230, 235, 552 P.2d 938 (1976).  Kansas courts define proximate cause as "that cause which in natural and continuous sequence, unbroken by an efficient intervening

cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act." *Hildebrand v. Sunbeam Products, Inc.*, 396 F. Supp. 2d 1241, 1249 (D. Kan. 2005)( quoting *Cochrance v. Schneider Nat. Carriers, Inc.*, 995 F. Supp. 1204, 1205 (D. Kan. 1998) (quoting in turn *Davey v. Hedden*, 260 Kan. 413, 426, 920 P.2d 420 (1996))); *see also Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 420, 228 P.3d 1048 (2010). The Kansas Supreme Court recently discussed proximate cause and intervening cause:

> This traditional statement of proximate cause incorporates concepts that fall into two categories: causation in fact and legal causation. *See, e.g., Corder v. Kansas Board of Healing Arts*, 256 Kan. 638, 655, 889 P.2d 1127 (1994); *Hammig v. Ford*, 246 Kan. 70, 72, 785 P.2d 977 (1990). To prove causation in fact, a plaintiff must prove a cause-and-effect relationship between a defendant's conduct and the plaintiff's loss by presenting sufficient evidence from which a jury could conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred. *See Baker v. City of Garden City*, 240 Kan. 554, 559, 731 P.2d 278 (1987); *Weymers v. Khera*, 454 Mich. 639, 647-48, 563 N.W.2d 647 (1997); *Waste Management v. South Central Bell*, 15 S.W.3d 425, 430 (Tenn. App. 1997). To prove legal causation, the plaintiff must show that it was foreseeable that the defendant's conduct might create a risk of harm to the victim and that the result of that conduct and contributing causes were foreseeable. *See Yount v. Deibert*, 282 Kan. 619, 624-25, 147 P.3d 1065 (2006). The concept of "intervening cause" relates to legal causation and "does not come into play until after causation in fact has been established." *Waste Management*, 15 S.W.3d at 432; see also Prosser and Keeton, The

Law of Torts § 44, p. 301 (5th ed. 1984) (recognizing the issue of intervening cause "does not arise until cause in fact is established").

An intervening cause is "one which actively operates in producing harm to another after the actor's negligent act or omission has been committed." Restatement (Second) of Torts 441 (1964). An intervening cause absolves a defendant of liability only if it supersedes the defendant's negligence. In other words, the superseding and intervening cause "component breaks the connection between the initial negligent act and the harm caused." *Hale [v. Brown]*, 287 Kan. [320] at 324, 197 P.3d 438 [(2008)]. But, one more factor-foreseeability-must be considered. "If the intervening cause is foreseen or might reasonably have been foreseen by the first actor, his negligence may be considered the proximate cause, notwithstanding the intervening cause. [Citation omitted.]" *Miller v. Zep Mfg. Co.*, 249 Kan. 34, 51, 815 P.2d 506 (1991).

*Puckett*, 290 Kan. at 420-21. Thus, "[p]roof of injury during use of the product, without more, is insufficient to establish that a defect in the product caused the injury." *Duffee By and Through Thornton v. Murray Ohio Mfg. Co.*, 879 F.Supp. 1078, 1083 (D. Kan.1995) (citing *Wilcheck*, 220 Kan. at 235-36), *aff'd*, 91 F.3d 1410 (1996).

As for the interaction between proximate cause and comparative fault, the Kansas Supreme Court has reconciled these concepts holding that proximate cause remains a viable element of proof and that "intervening and superseding causes, which cut off liability for earlier negligence, *are still recognized in extraordinary cases.*" *Puckett*, 290 Kan. at 422-23 (citations omitted). In *Puckett*, the Kansas Court was

18

addressing whether the negligence of later health care providers was a

concurrent or intervening cause and quoted favorably these propositions

from another venue:

> "'In order to relieve a defendant of liability for [a] negligent act, the
> negligence intervening between the defendant's negligent act and
> injury must so entirely supersede the operation of the defendant's
> negligence that it alone, without any contributing negligence by the
> defendant in the slightest degree, causes the injury.' [Citations
> omitted.]" *Williams* [*v. Le*], 276 Va. [161] at 167[, 662 S.E.2d 73
> (2008)]. Conversely, "'an intervening cause does not operate to
> exempt a defendant from liability if that cause is put into operation by
> the defendant's wrongful act or omission.' [Citation omitted.]"
> *Williams*, 276 Va. at 167.

290 Kan. at 426-27. The Kansas Court recognized an intervening cause

instruction as appropriate when the negligence of subsequent health care

providers is "so extraordinary" as to be distinguishable from ordinary,

foreseeable negligence. 290 Kan. at 433.

> "Although usually the issue of proximate cause is a question of

fact for the jury, it becomes a question of law when all evidence relied upon

by a party is undisputed and susceptible of only one inference." *St. Clair v.*

*Denny*, 245 Kan. 414, 420, 791 P.2d 1043 , 1047 (1989) (citation omitted).

"'Whether risk of harm is reasonably foreseeable is a question to be

determined by the trier of facts. Only when reasonable persons could

arrive at but one conclusion may the court determine the question as a

matter of law.'" *Puckett*, 290 Kan. at 434 (quoting *Nero v. Kansas State University*, 253 Kan. 567, 583, 861 P.2d 768 (1993)). Thus, for the court to grant summary judgment on the issue of causation as argued here, it "must determine that there is conclusive proof that the actions of" the plaintiff, his employer and co-workers "were the superseding cause of plaintiff's injuries and that a jury could not, as a matter of law, assign any percentage of liability to" BTM. *Sell v. Bertsch and Co., Inc.*, 577 F. Supp. 1393, 1397 (D. Kan. 1984).

*Defendant's Concessions and Arguments*
*on Summary Judgment*

With regard to the plaintiff's strict liability theory, the defendant concedes due to conflicting expert witness opinions that summary judgment is not proper on the element whether the Tog-L-Loc press was defective or unreasonably dangerous as manufactured. (Dk. 83, p. 19). The defendant, however, contends that "the plaintiff's failure to comply with OSHA and Amarr's lockout/tagout policies is an *intervening* cause, completely unforeseeable to the defendant and it eliminates the defendant's liability." *Id.* at 20. In short, BTM regards this failure to comply with lockout/tagout policies as to be so extraordinary and unforeseeable that it is more than a contributory cause and is an intervening cause cutting

off the defendant's liability.

Relying on the terms of the KPLA provision at K.S.A. § 60-3305, BTM asserts it had no duty to warn about the risks of working on an energized Tog-L-Loc and no duty to instruct on safely making depth adjustments to the Tog-L-Loc. A reasonable user would be trained and should know that arms and hands should not be inserted in the machine while it was energized due to the risk of "*unexpected* energization or start-up of the machine or equipment, or release of stored energy" causing injury to the user. 29 C.F.R. § 1910.147(a)(1)(I). BTM argues the same knowledge of risk is the purpose behind Amarr's own lockout/tagout policy. BTM denies any duty to warn or instruct on the safe use of the Tog-L-Loc because Amarr Doors knew what action needed to be taken to prevent injury and if that action had been taken then there would have been no risk of injury to the plaintiff. BTM further contends that a reasonable user similarly situated would have been required to follow the lockout/tagout policy and that Amarr required its employees to comply with this procedure.

In its reply brief, BTM raises new challenges that are inappropriate to consider now since they were first raised in a reply brief. "Courts in this district generally refuse to consider issues raised for the first

time a reply brief." *Niles v. American Airlines, Inc.*, 563 F. Supp. 2d 1208, 1213 (D. Kan. 2008) (citing *Liebau v. Columbia Casualty Co.*, 176 F. Supp. 2d 1236, 1244 (D. Kan. 2001); *see Mike v. Dymon, Inc.*, No. 95-2405-EEO, 1996 WL 427761, at *2 (D. Kan. July 25, 1996) ("In pursuit of fairness and proper notice, the court generally summarily denies or excludes all arguments and issues first raised in reply briefs.")); *cf. Hutton Contracting Co. v. City of Coffeyville*, 487 F.3d 772, 788 (10th Cir. 2007) ("[W]e do not consider arguments raised for the first time on appeal in a reply brief."). Despite the defendant's request in its reply brief, (Dk. 114, p. 4), the court will not make a finding on the applicability of the minor adjustment exception in OSHA regulation, 29 C.F.R. § 1910.147(a)(2). Nor will the court entertain or decide the defendant's arguments in its reply brief that the emergency stop button is not defectively designed. (Dk. 114, pp. 4-7).

Causation

BTM advocates taking a hard look at the negligence of the plaintiff, the co-worker and the employer to "determine whether it was foreseeable that [they] . . . would be negligent to the nature and extent established in the undisputed facts." (Dk. 83, p. 22). BTM sold the Tog-L-Loc with guards covering the pinch point. Amarr was using the Tog-L-Loc

without these guards in place, and it had no manufacturer-issued owner's manual for this machine at its facility. While the guards necessarily would have had to been removed in order to make the required depth adjustments on this occasion, BTM argues the presence of the guards would have served to warn the plaintiff and others that they were entering a dangerous area. With respect to the owner's manual, BTM highlights that it is being asked to foresee that a customer would not retain or consult the owner's manual, that a customer would not use the manual to train his employees, and that a customer's employee would make adjustments on the machine without knowing how different controls on it functioned. BTM concludes by arguing the unforeseeability to a machine manufacturer that a customer would not sufficiently train its employees on the lockout/tagout policies or would allow its employees to ignore these policies. BTM describes this as a "freak accident" that is "highly unlikely" to be repeated and that was not "reasonably foreseeable" to it. (Dk. 114, pp. 2-3).

In pressing its position, BTM recognizes there is no Kansas case law addressing this foreseeability question for industrial machine manufacturers in the context of repairs or maintenance work to the machines. BTM cites the older decision of *John C. Motter Printing Press*

*Company v. Lockwood Greene Engineers, Inc.*, 305 F. Supp. 1001 (D.R.I. 1969), for the holding that a manufacturer had no duty to warn of the danger of cleaning a machine while energized, as the employee knew he was not to do so under company policy and his violation of the same was the intervening cause.  The court found that cleaning the press while it was moving was a misuse not anticipated by the manufacturer and created a special hazard known to the employees.  The court concluded that there was no duty to warn "of the potential hazard involved in said misuse of said press."  305 F. Supp. at 1005-1006.[1]  BTM also cites *Vold v. ARPAC, LP.*, 2008 WL 2788727 (N.D. Ohio 2008), as an instance where summary judgment was granted to the manufacturer when the plaintiff employee was injured while repairing a machine that the employee failed to lock out. BTM's reliance on *Vold* is problematic in that the federal district court relied on an assumption of risk defense available in Ohio product liability actions, but in Kansas "the common-law assumption of risk doctrine is restricted to cases involving employer-employee relationships."  *Sall v. T's, Inc.*, 281 Kan. 1355, 1372, 136 P.3d 471 (2006)(citation omitted).  This doctrine is subsumed in the Kansas law that compares "all types of fault."  *See Emig*

_____

[1]Frankly, the court finds the analysis and discussion in *Motter* to be of such a conclusory nature that they are not particularly instructive here.

*v. American Tobacco Co., Inc.*, 184 F.R.D. 379, 390 (D. Kan. 1998).

The plaintiff counters with *Berry v. OshKosh Truck Corp.*, 2007 WL 174334 (E.D. Cal. 2007), in which a maintenance mechanic was killed while repairing a refuse packer without following the lockout/tagout procedures established in OSHA regulations and included in the packer's manual as warnings and instructions. The parties agreed "that the accident would not have occurred if" the lockout/tagout procedures had been followed. *Id.* at *2. The packer's manufacturer moved for summary judgment arguing in part that the mechanic was per se negligent. Specifically, the manufacturer argued "the packer's design was not a substantial cause . . . , because he would not have been injured if he had followed lockout/tagout procedures." *Id.* at *4. The court was critical of the argument for not only "conflat[ing] the concepts of 'substantial factor' and 'superseding cause,'' but concluded that even if construed as a superseding cause defense then it would still require "findings as to the foreseeability of Berry's (mechanic's) method of repair and failure to follow safety instructions, an issue disputed by the parties and their experts." *Id.* As for the manufacturer's argument that the mechanic's failure to follow the lockout/tagout procedures, the court observed:

California law, however, treats an injured party's failure to follow instructions or heed warnings in product defect cases as a matter of comparative negligence rather than a complete bar to recover, absent additional factual evidence regarding the foreseeability of a product's use. *See Daly v. General Motors Corp.*, 20 Cal. 3d 725, 745-46, 144 Cal. Rptr. 380, 575 P.2d 1162 (1978). Lockout/tagout procedures aimed to protect users from the danger posed by the alleged design defects: unexpected movement within the packer body. "To the extent the user does elect to use the produce with knowledge fo the danger posed by the defect, the user's actions are subsumed by comparative negligence. The manufacturer is not relieved of its duty to make a product without defect." (citation omitted).

*Id.* at 5.

The court's own research on this causation issue reveals a number of decisions, but none of them, including those cited by the parties, bears a strong factual similarity to the case at hand or convincingly demonstrates that the particular factual questions come together here as to be decided as a matter of law. *See* Randy Koenders, Annotation, *Products Liability: sufficiency of evidence to support product misuse defense in actions concerning commercial or industrial equipment and machinery*, 64 A.L.R.4th 10 1988); *see, e.g., Solo v. Trus Joist MacMillan*, 2004 WL 524898 at *13 (D. Minn. 2004) ("alleged OSHA violations not superseding causes"). Nor do those decisions give the court much pause for Kansas law is clear that "it is only in extraordinary cases that there is an intervening

26

cause," *Puckett*, 290 Kan. at 429. Moreover, "whether the risk of harm is reasonably foreseeable is a question for the trier of fact. Only when reasonable persons could arrive at but one conclusion may the court decide the question as a matter of law." *Long v. Turk*, 265 Kan. 855, 865, 962 P.2d 1093 (1998). The summary judgment record does not show this to be an extraordinary case susceptible to but one conclusion.

The defendant manufacturer principally emphasizes the OSHA lockout/tagout policy and its inability to foresee that an employer would allow or its employees commit violations of this policy or the employer's own similar policy. The defendant adds the lack of knowledge over the emergency stop button's operation and the nature of the "freak accident" as to bar any finding of reasonable foreseeability. The opinion testimony of the plaintiff's expert, Mr. Skaggs, is enough to create an issue for the jury on whether the OSHA lockout/tagout exception for minor adjustments applies here based on the frequency and need for depth adjustments. The summary judgment record does not sustain the defendant's position.

The court is convinced there are a number of factual questions on the foreseeability of maintenance mechanics making depth adjustments on the Tog-L-Loc while it was in the manual mode without shutting down all

power to it.  The testimony of Amarr maintenance employees, including the

ambiguous testimony of Mr. Bollinger who supervised them, indicates it

was the practice, and maybe even the policy at Amarr, to not lockout/tagout

the Tog-L-Loc for depth adjustments that were being made daily at the

beginning and end of the third shift.  The employees believed the manual

mode gave them sufficient control over the machine's operation.  The

evidence suggests they even may have been trained to expect the same.

This is further bolstered by Mr. Skagg's opinion that the adjustment

exception to the OSHA regulation arguably applies to this depth

adjustment.  There is certainly a question of fact whether a Tog-L-Loc

manufacturer should not reasonably foresee that mechanics would make

regular depth adjustments in the manual mode trusting in their ability to

maintain control of the operating switches and saving the time and work

involved with locking out both electrical and pneumatic power.[2]  Even if the

_____

[2] *See, e.g., Howard v. TMW Enterprises, Inc.*, 32 F. Supp. 2d 1244,
1252 (D. Kan. 1998).  ("Plaintiff has presented evidence that Autojectors
recognized that nozzle drool might be a problem. Because the machine
was designed for high production, shutting it down to clean the nozzle drool
would clearly be undesirable.  The Court cannot conclude as a matter of
law that defendant could not reasonably foresee that workers would modify
the machine to by-pass the safety shield under these circumstances.  *See
St. Clair v. Denny*, 245 Kan. 414, 420, 781 P.2d 1043, 1047 (1989) (except
where only one inference can be drawn from facts, foreseeability is
question for jury).").

unexpected energizing of a machine is the very risk contemplated by the OSHA regulation, this does not relieve a manufacturer from designing a machine to address a reasonably foreseeable misuse of the machine.

The plaintiff also has come forward with evidence creating questions of fact over the foreseeability of mechanics accidentally depressing an emergency stop button and then not anticipating that the machine would move to create a pinching point. The plaintiff's expert witness, Mr. Skaggs, opined that emergency buttons are designed to be easily accessible and that these buttons are easily activated by accident because of their design and location. Besides the NFPA standard, the plaintiff's expert witnesses have testified that the emergency stop button is intended to function by stopping all machine motion. The testimony from Amarr's supervisors and employees shows their understanding and expectation of emergency stop buttons. The failure to retain the owner's manual and the failure to train mechanics on the operation of the emergency stop button are factual questions that do not take this foreseeability question out of the jury's realm to decide, for reasonable persons could differ on whether the risk of harm is reasonably foreseeable here.

## Duty to Warn

The defendant denies having any duty to warn or to instruct on the safe use of the Tog-L-Loc. Advocating the same premise of required compliance with lockout/tagout regulations and policies, the defendant argues the plaintiff cannot prevail as a matter of law, because the risks here would have been eliminated with compliance. The defendant specifically advances the KPLA's terms at K.S.A. 60-3305 which provide:

> In any product liability claim any duty on the part of the manufacturer or seller of the product to warn or protect against a danger or hazard which could or did arise in the use or misuse of such product, and any duty to have properly instructed in the use of such product shall not extend:
>
> (a) To warnings, protecting against or instructing with regard to those safeguards, precautions and actions which a reasonable user or consumer of the product, with the training, experience, education and any special knowledge the user or consumer did, should or was required to possess, could and should have taken for such user or consumer or others, under all the facts and circumstances;
>
> (b) to situations where the safeguards, precautions and actions would or should have been taken by a reasonable user or consumer of the product similarly situated exercising reasonable care, caution and procedure; or
>
> (c) to warnings, protecting against or instructing with regard to dangers, hazards or risks which are patent, open or obvious and which should have been realized by a reasonable user or consumer of the product.

The defendant denies having any duty to warn or instruct on the risks created by this "freak accident" when the mechanics were not complying

with the OHSA regulations and the company policy on lockout/tagout.  The

defendant asserts Amarr had special knowledge that following the

lockout/tagout policy would prevent this risk of injury.  The defendant

further asserts that Amarr, the plaintiff, and co-worker Thompson should

have de-energized the machine as this would be the same reasonable

action taken by a similarly-situated consumer, and there is no duty to warn

about this precautionary conduct.  Finally, the defendant labels the

"possibility of an 'unexpected start up'" as an open and obvious risk about

which the manufacturer had not duty to warn as a matter of law.

A failure to warn claim in Kansas is subject to the same

standard of reasonableness whether the theory is negligence or strict

liability.  *Duffee*, 879 F. Supp. at 1081 (and cases cited therein).  "'A product

may be perfectly manufactured and meet every requirement for its

designed utility and still be rendered unreasonably dangerous through

failure to warn of its dangerous characteristics.'"  *McCroy ex rel. McCroy v.*

*Coastal Mart, Inc.*, 207 F. Supp. 2d 1265, 1274 (D. Kan. 2002) (quoting

*Samarah v. Danek Med., Inc.*, 70 F. Supp. 2d 1196, 1204 (1999)).  As for

the manufacturer's duty to warn, Kansas courts follow the rule stated in

Restatement (Second) of Torts § 388 (1963):

> One who supplies . . . a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel . . . for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

*Hiner v. Deere and Co., Inc.,* 340 F.3d 1190, 1193 (10th Cir. 2003) (quoting

Restatement (Second) of Torts § 388 (1965) as cited in *Long v. Deere &*

*Co.*, 238 Kan. 766, 715 P.2d 1023, 1029 (1986)).

As the defendant here stresses, the KPLA limits a

manufacturer's duty to warn. *See Patton v. Hutchinson Wil-Rich Mfg. Co.*,

253 Kan. 741, 748, 861 P.2d 1299 (1993). With regard to obvious or

known risks, the Tenth Circuit has observed that:

> the Kansas courts have stressed that manufacturers should not be held liable for failing to warn about risks that would be apparent to ordinary users. *See, e. g., Miller v. Lee Apparel Co.*, 19 Kan.App.2d 1015, 881 P.2d 576, 588 (1994) ("A product is not unreasonably dangerous when its degree of danger is obvious and generally known or recognized. If a danger is obvious, then its obviousness constitutes a warning, and the product seller's failure to provide a separate warning should not constitute a defect.") (internal quotation marks and citations omitted). Moreover, regardless of the ordinary user's knowledge of the danger, "[t]here is no duty to warn of dangers actually known to the user of a product. . . ." *Long*, 715 P.2d at 1029 (internal quotation marks and citation omitted); *accord Miller*, 881 P.2d at 588.

*Hiner*, 340 F.3d at 1194.  In assessing the known or obvious dangers, a court "may take into account people's misconceptions about the possibility of using the product safely."  *Hiner*, 340 F.3d at 1195.  This point is further made in *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1104 (10th Cir. 1991):

> Whether a danger is open and obvious depends not just on what people can see with their eyes but also on what they know and believe about what they see. In particular, if people generally believe that there is a danger associated with the use of a product, but that there is a safe way to use it, any danger there may be in using the product in the way generally believed to be safe is not open and obvious.

(internal quotation marks omitted).

For summary judgment purposes, the defendant is no more successful in recasting the same lockout/tagout arguments to prove as a matter of law that it had no duty to warn.  The premise to the defendant's arguments is that unexpected startups are always a risk, so a machine manufacturer should have no duty to warn when the risk is preventable by shutting down all power sources.  The defendants offer no authority for this sweeping proposition that could mean summary judgment in nearly every instance where shutting down all power would have prevented the accident.  "[M]erely because a product is misused does not render a particular danger open and obvious."  *Wheeler*, 935 F.2d at 1104.  A

plaintiff may still recover upon proving "the danger is not within the cognition of a reasonable user." *Id.* at 1105. The plaintiff's warning claims here are tied directly to the evidence of the emergency stop button's non-standard operation.

The record does not sustain summary judgment on this warning claim. As discussed earlier, there remains a genuine factual dispute over whether the depth adjustments on the Tog-L-Loc in the manual mode violated the OSHA regulation and/or Amarr's policy. There also appears to be a genuine issue of material fact as to whether a reasonable mechanic in these circumstances would have employed a full lockout/tagout for making these daily depth adjustments. The defendant has not carried its initial burden of showing the absence of a genuine issue of material fact on whether a reasonable mechanic with the plaintiff's training and experience would know or should know that the emergency stop button on the Tog-L-Loc when activated would raise the cross-arm when the machine was in the manual mode. The plaintiff has come forward with evidence that raises factual issues concerning both knowledge of the emergency stop button's unusual or non-standard operation and the need for instructions and/or warning on the button's operation. Summary judgment is denied.

In this motion, the defendant also argues that the plaintiff's expert witness, Mark Passamaneck, should be excluded from testifying under *Daubert*.  The defendant subsequently filed a separate motion (Dk. 91) asking for the same relief, incorporating the same brief, and attaching Mr. Passamaneck's deposition.  So the record is clear, the court will discuss that issue now under the title of the defendant's separate motion.

**MOTION TO EXCLUDE TESTIMONY OF MARK PASSAMANECK (Dk. 91) and MOTION TO EXCLUDE TESTIMONY OF DR. RAVINDRAN SABAPATHY (Dk. 92)**

### *Daubert* General Standards

The admission of expert witness testimony is governed by Federal Rule of Evidence 702.  "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue," then a court may allow an expert witness qualified "by knowledge, skill, experience, training, or education" to testify by opinion or otherwise "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.  This rule requires a court to "consider first, whether the expert witness is qualified to give the opinion and, second,

whether the opinion expressed 'rests on a reliable foundation and is relevant to the task at hand.'" *Utility Trailer Sales of Kansas City, Inc. v. MAC Trailer Mfg., Inc.*, 267 F.R.D. 368, 370 (D. Kan. 2010) (quoting *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 509 U.S. 579, 591 (1993).

In *Daubert*, the Supreme Court expounded on the district courts' gatekeeping function to ensure both the relevance and reliability of scientific expert testimony. A "district court has discretion in how it conducts the gatekeeper function, . . . [but] it has no discretion to avoid performing the gatekeeper function." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir.), *cert. denied*, 540 U.S. 1003 (2003). A district court is required to apply the proper standard and to fulfill its gatekeeper function. *Id.* (citations omitted). At the same time, the district courts retain "broad discretion . . . both in deciding how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate determination of reliability." *Id.* (citations omitted). Proponents of the expert testimony have the burden of establishing admissibility under Rule 702 by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n. 10; *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001).

Rule 702 requires an expert to be qualified "by knowledge, skill, experience, training or education" to render the opinion at issue. As restated by the Tenth Circuit, the witness is "required to possess 'such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would aid the trier of fact in his search for truth.'" *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (quoting *Graham v. Wyeth Labs*, 906 F.2d 1399, 1408 (10th Cir.), *cert. denied*, 498 U.S. 981 (1990)). Basically, the court must decide if the proposed testimony comes within the "reasonable confines" of the plaintiff's expertise. *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) ("'As long as an expert stays within the reasonable confines of his subject area, our case establishes a lack of specialization does not affect the admissibility of [the expert] opinion, but only its weight.'" (quoting *Compton v. Subaru of America, Inc.*, 82 F.3d 1513, 1519-20 (10th Cir.), *cert. denied*, 519 U.S. 1042 (1996))).

The court next determines "whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in *Daubert*." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir.), *cert. denied*, 130 S. Ct. 54 (2009). In other words, the court looks for whether the

proffered expert testimony "has 'a reliable basis in the knowledge and experience of his discipline.'" *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert*, 509 U.S. 579, 592). The court must be mindful that its focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Thus, the proof need not establish that the expert is "indisputably correct" but only that the "method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements." *Dodge v. Cotter Corp.*, 328 F.3d at 1222. The factors involved in a reliability determination include:

> (1) whether a theory has been or can be tested or falsified; (2) whether the theory or technique has been subject to peer review and publication; (3) whether there are known or potential rates of error with regard to specific techniques; and (4) whether the theory or approach has "general acceptance."

*Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2005) (citing *Daubert*, 509 U.S. at 593-94), *cert. denied*, 546 U.S. 926 (2005). However, these factors are "neither definitive nor exhaustive and . . . a trial judge has wide discretion both in deciding how to assess an expert's reliability and in making a determination of that reliability." *Bitler*, 400 F.3d at 1233.

Besides "ensuring that an expert's testimony . . . rests on a

38

reliable foundation," the district court also must inquire into whether the proposed testimony is sufficiently "relevant to the task at hand." *Daubert*, 509 U.S. at 597. In other words, the court must determine whether the testimony "fits" the case, that is, whether the "expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591. An expert opinion "must be based on facts which enable [him] to express a reasonably accurate conclusion as opposed to conjecture or speculation . . . absolute certainty is not required." *Dodge v. Cotter Corp.*, 328 F.3d at 1222 (10th Cir. 2003).

The *Daubert* assessment, in summary, charges a court with finding that the expert has the required expertise, that the expert's proposed testimony "fits" the issues of the case, and that the expert's opinions or conclusions are (1) based upon adequate facts or data, (2) built around reliable principles and methods, and (3) arrived at from reliably applying the principles and methods to the facts of the case.

*Daubert* has not changed the court's general practice of rejecting expert testimony as "the exception rather than the rule." Rule 702 advisory committee's note (2000). The district court's gatekeeping functions are not

meant to supplant "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . [as] the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted). Thus, it is for the trier of fact "to evaluate the proper weight to be given [an] expert's testimony." *Jacklovich v. Simmons*, 392 F.3d 420, 429 (10th Cir. 2004); *see also Robinson v. Missouri Pacific R.*, 16 F.3d 1083, 1090 (10th Cir. 1994) ("Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions. The jury is intelligent enough . . . to ignore what is unhelpful in its deliberations."). At the same time, the court is not to allow expert testimony that invades the province of the jury or renders opinions on issues of law. *Parker v. Wal-Mart Stores, Inc.*, 267 F.R.D. 373, 375 (D. Kan. 2010).

<u>Mark Passamaneck</u>

The plaintiff amended his complaint to include a claim for failure to give adequate warnings on the Tog-L-Loc's movement upon the activation of the emergency stop button and for failure to provide adequate instructions on safely performing punch depth adjustments. The plaintiff disclosed the

expert report of Mark Passamaneck with following conclusion:

> BTM provided inadequate instruction with regards to the Punch Depth adjustments that were being performed by Mr. Markham on the date of the incident.  Had BTM properly warned that a pinching hazard could be created with the operation of the "Emergency Stop" button, the subject incident could have been prevented.  Lockouts could have been incorporated into the design of the machine guards to prevent movement of ram during maintenance operations.  Pinch point hazard communication labeling should have also been provided and likely would have reduced or eliminated the hazard which caused the injury to Mr. Markham.  The overall lack of instruction with regards to the hidden danger associated with the "Emergency Stop" button during maintenance operations was a cause and/or contributing factor to the subject incident.

(Dk. 83-20, p. 3).

Mr. Passamaneck's opinion on the adequacy of the instructions and/or warnings was based in part on his review of a "BTM Set-up & Maintenance Guide--Air Powered Toggle Press."  *Id.* at p. 2.[3]  At his deposition, Mr. Passamaneck testified the Tog-L-Loc had to be energized in order to make the punch depth adjustments.  The defendant's expert, Morris Farkas, reports that the adjustments can be made with a lockout/tagout, and the plaintiff's other expert, Joseph Skaggs, also testified the adjustments could be made with lockout/tagout but that it would be a "cumbersome

---

[3]While admitting this is a BTM manual, the defendant contends this is not an owner's manual that would contain additional information on operation of Tog-L-Loc.

process."

The defendant's motion to exclude Mr. Passamaneck under *Daubert* takes a shotgun approach challenging qualifications, reliability and relevance and offering numerous points under each. In particular, the defendant challenges Mr. Passamaneck's training and experience, his gathering of facts and data, his lack of testing, his failure to cite any applicable standards, and his opinions for being not technical or helpful to a jury. The defendant broadly seeks to exclude all of Mr. Passamaneck's testimony without correlating particular arguments to certain opinions. The defendant's broad-brush approach was not helpful to the court's efforts in performing its gatekeeping function. The court will deny the defendant's motion at this stage as raising issues going more to credibility and weight than admissibility under *Daubert*. The court, however, reserves its opportunity later to revisit subsequent challenges to specific testimony from Mr. Passamaneck.

The defendant first objects to the six-page affidavit from Mr. Passamaneck submitted with the plaintiff's memorandum opposing this motion.[4] The defendant complains this is an inappropriate attempt to

---

[4]The defendant's objection appears in its reply brief rather than in a separate motion. The plaintiff did not seek leave to file a sur-reply, so the

rehabilitate the expert. The defendant complains that in Mr. Passamaneck's report and deposition there is no disclosure of the basis for his expertise with warnings in his *curriculum vitae*, of his reliance on old established engineering texts in his report, and of his discussion of engineering concepts in support of his conclusions. It should go without saying that "[t]he orderly conduct of litigation demands that expert opinions reach closure." *Miller v. Pfizer, Inc.*, 356 F.3d 1326, 1334 (10th Cir.), *cert. denied*, 543 U.S. 917 (2004). The defendant made no prior challenge to Mr. Passamaneck's report of September 30, 2008, for compliance with Rule 26(a)(2), and it took Mr. Passamaneck's deposition on September 23, 2009. Nor did the defendant challenge the report based on the deposition testimony. While Mr. Passamaneck's affidavit certainly offers more details than his earlier report, the court does not find that it contains additional opinions or facts that were not fairly covered in the earlier report, *curriculum vitae*, and/or deposition. The defendant has offered no showing that the additional matters found in the affidavit prejudice or unfairly surprise the defendant in arguing the motion or preparing for trial.

---

court has not heard from the plaintiff on this objection. The court's ruling on this motion and on the defendant's motion to exclude Dr. Sabapathy's testimony is due in part to the defendant's choice of this procedural venue.

Mark Passamaneck is a licensed professional mechanical engineer with graduate level courses in machine design and forensic engineering. Before obtaining his mechanical engineering degree, he worked as a technician in forensics and failure analysis, and following graduation, he has accumulated sixteen years of experience in the forensic field. Most of Mr. Passamaneck's work involves investigating and evaluating failed systems, components, and product safety. "He has investigated numerous cases involving personal injuries arising from component failures, human factors, improper use, insufficient instructions, and warning issues." (Dk. 83-20, Exp. Rept. p. 4). Mr. Passmaneck avers: "My background in dealing with all manner of warnings allowed me to be able to evaluate the absence of warnings and labeling of the BTM Tog-L-Loc press machine against the design safety hierarchy which has been part of the standard of care in mechanical engineering and design since before this machine was sold in 1986." (Dk. 105-4, ¶ 10). In 1986, Mr. Passamaneck was taking a college course in machine design. He has available to him now and consults regularly standard texts on product safety and liability published in the 1980s. He has published articles on the engineering design process,

44

warnings and labels, and the applicable safety hierarchy.  By education, training and experience, Mr. Passamaneck is able to testify on the need for instructions and warnings on commercial machinery.  The court overrules the defendant's motion to exclude Mr. Passameneck's testimony based on his qualifications.

<em>Reliability</em>

The defendant challenges Mr. Passamaneck's testimony as based solely on his own opinion or specialized knowledge and not on any tests, calculations, or methodologies.  The defendant is critical that Mr. Passamaneck did not compare the warnings and instructions for similar machines manufactured near in time to the Tog-L-Loc and did not create an exemplar to show what the manufacturer should have done.  The defendant asserts Mr. Passamaneck's opinion is speculative as he reviewed standards inapplicable by time and then assumed what industry may have been contemplating at the time in question.

The record certainly suggests that Mr. Passamaneck could have done more, but it does not show that Mr. Passamaneck's opinion lacks a reliable basis in knowledge and experience for his discipline.  He reviewed the reports of other experts, photographs of the machine, manual materials,

plaintiff's interrogatory answers, and the insurance report and claim.   As

discussed above, Mr. Passamaneck has a demonstrable knowledge of

warnings and the applicable safety hierarchy during the relevant time period.

The Tenth Circuit has observed:

> Although it is not always a straightforward exercise to disaggregate
> method and conclusion, when the conclusion simply does not follow
> from the data, a district court is free to determine that an impermissible
> analystical gap exists between premises and conclusion. . . .  When
> examining an expert's, however, the inquiry should not be aimed at
> "cosmic understanding but for the particularized resolution of legal
> disputes." *Daubert*, 509 U.S. at 597.  Thus, it is the specific relation
> between an expert's method, the proffered conclusions, and the
> particular factual circumstances of the dispute, and not asymptotic
> perfection, that renders testimony both reliable and relevant.

*Bitler*, 391 F.3d at 1121 (some citations omitted).  The dispute here is not

over the adequacy of a particular warning but on the complete absence of

one.  Based on Mr. Passamaneck's review of the machine, there are no

warnings or labels on the Tog-L-Loc concerning the movement activated by

the emergency stop button and the pinch points created by its unique

operation.  While the defendant complains about the lack of testing, it has

not shown that such testing would be reasonably expected or necessary for

such testimony to be reliable here.  The record presently shows that an

expert with Mr. Passamaneck's knowledge and experience with forensic

engineering and machine design would have a reliable basis from which to

testify about the need of such a warning or label due to the unique and non-standard operation of this emergency stop button and about the general importance of such warnings to operators and mechanics.

*Relevance*

The defendant contends that Mr. Passamaneck's testimony offers no technical opinion based on any analysis or explanation of any complicated scientific issues. The defendant denies that Mr. Passamaneck's opinion is anything more than speculation over the need of a warning about which the jury is equipped to decide itself.

Mr. Passamaneck's testimony over the operation of the emergency stop button and the need for warnings and labels is certainly tied to the central facts of this case as to assist the jury in resolving the factual disputes. On the present record, it appears his testimony is outside the realm of a jury's common knowledge, for his opinions will be based on knowledge and evaluation of the safety hierarchy, product designs, and industry practices and standards. The average juror could hardly be versed in identifying and evaluating pertinent factors for warnings and instructions regarding depth adjustments and the emergency stop button's operation on an industrial press. As disclosed, Mr. Passamaneck's testimony is not

47

intended to supplant the jury's role in deciding the factual disputes.  For all these reasons, the court denies the defendant's motion to exclude the testimony of Passamaneck on the record as it currently stands and denies the defendant's motion for summary judgment based on the exclusion of that testimony.

### Dr. Ravindran Sabapathy

Dr. Sabapathy is a licensed clinical psychologist who is professionally affiliated with a pain management clinic offering behavioral pain management services to patients with acute and chronic pain.  Dr. Sabapathy has been treating the plaintiff since March 2007 with behavioral pain management and psychotherapy "to help manage chronic pain and associated psychological symptoms following a severe work related injury on February 24, 2006."  (Dk. 106-3 p. 13, Sabapathy's Report).  Dr. Sabapathy's treatment included an initial diagnostic interview and some psychological testing.  Dr. Sabapathy made a mental health diagnosis following the criteria of the Diagnostic and Statistical Manual ("DSM") based on the interview and psychological testing.

The defendant challenges the reliability of Dr. Sabapathy's expert testimony on these grounds:  his diagnoses and prognoses lack

specific findings, his opinions are based solely on personal perceptions drawn from three years of monthly sessions, his initial testing in April of 2007 was subjective and no further testing has been done, and his opinions are based solely on the plaintiff's subjective complaints without any objective testing involving validity scales. The defendant acknowledges that Dr. Sabapathy may testify as a fact witness but seeks to circumscribe that testimony to only the nature of treatment given and to exclude any diagnoses, opinions on necessary future treatment, and opinions on "validity of the plaintiff's claims." (Dk. 92, p. 3). Because it finds that the defendant's motion largely challenges only the weight and credibility of Dr. Sabapathy's testimony, the court will address the following factors summarily.

## Qualifications

The defendant concedes that the Dr. Sabapathy's *curriculum vitae* "clearly establishes that he has the education and experience necessary to render expert opinions in the field of psychology." (Dk. 92, p. 9).

## Reliability

After closely reviewing Dr. Sabapathy's deposition, report and affidavit, the court is satisfied that he possessed a reliable basis in

knowledge and experience and employed a sound methodology in reaching an opinion based on facts meeting the reliability requirements of Rule 702. The court has no substantial reason to question that Dr. Sabapathy's diagnostic interview and series of psychological tests provided him with sufficiently reliable information for diagnosing the plaintiff and establishing a course of treatment. The difference of expert opinions over the comparative reliability of different tests and methodologies is a question for the jury. The court has no legal or factual basis for concluding that Dr. Sabapathy's approach falls below threshold of reliable. Having treated the plaintiff on a monthly basis for at least three years, Dr. Sabapathy, by experience, education and training, is certainly positioned to express his opinion about the effectiveness of treatment, the plaintiff's current condition, the plaintiff's prognosis, and the need for ongoing treatment.

Behind all of the defendant's challenges is that Dr. Sabapathy did not perform the additional psychological testing to evaluate whether Mr. Markham was exaggerating or malingering about his pain and the related psychological and emotional problems. That the defendant's chosen expert found some evidence of exaggeration through other testing hardly shows that Dr. Sabapathy's opinion fails to meet the standards of *Daubert.* Dr.

Sabapathy's testing corroborated his diagnosis and the results of his interview.  Dr. Sabapathy testified to the reliability of his testing protocol for making a diagnosis and treating his patients with chronic pain.  The dispute over the need for additional testing goes to the weight of the expert's testimony, not its foundation of reliability.   The defendant's objections concern matters more appropriately suited for cross examination.

**PLAINTIFF'S MOTION IN LIMINE (Dk. 90)**

The plaintiff seeks to exclude the testimony of the defendant's second expert, Morris Farkas, who was subsequently named to address the plaintiff's added claim for failure to warn.  The plaintiff notes that Mr. Farkas has similar qualifications to the defendant's other expert witness, Lanny Berke, and that Mr. Farkas has submitted an expert report covering all the topics already addressed in Mr. Berke's report.  Calling the overlap in the reports essentially identical opinions, the plaintiff cites Fed. R. Evid. 403 and seeks to limit Mr. Farkas's testimony to the warning claim.  The plaintiff argues that Mr. Farkas's testimony on the other claims would be cumulative and a waste of trial time.

The defendant moves to strike the plaintiff's motion in limine for failure to comply with D. Kan. Rule 7.6(a) by not submitting a statement of

facts with references to the record.  The plaintiff has filed no reply or response to the defendant's motion and/or objection.  Due to the summary nature of the plaintiff's motion and arguments and due to the lack of record citations showing the testimony to be cumulative, the court will sustain the defendant's motion by overruling the plaintiff's motion in limine for its violation of D. Kan. Rule 7.6(a).

IT IS THEREFORE ORDERED that BTM's motion for partial summary judgment (Dk. 78) is granted;

IT IS FURTHER ORDERED that BTM's motion for summary judgment (Dk. 82), motion to exclude testimony of Mark Passamaneck (Dk. 91), and motion to exclude testimony of Dr. Sabapathy (Dk. 92) are denied;

IT IS FURTHER ORDERED that BTM's motion to strike (Dk. 98) is granted insofar as the plaintiff's motion in limine (Dk. 90) is overruled.

Dated this 30th  day of March 2011, Topeka, Kansas.


s/ Sam A. Crow_____
Sam A. Crow, U.S. District Senior Judge